Timothy GONZALES, Petitioner–Appellant,

v.

David McKUNE, Warden, Lansing Correctional Facility, and Carla Stovall, Kansas Attorney General, Respondents–Appellees.

No. 00–3003.

United States Court of Appeals, Tenth Circuit.

April 18, 2001.

Jean K. Gilles Phillips, The Paul E. Wilson Defender Project, University of Kansas School of Law, Lawrence, KS, for Petitioner–Appellant.

Jared S. Maag, Assistant Attorney General, Office of the Kansas Attorney General, Topeka, KS, for Respondents–Appellees.

Before EBEL and BRISCOE, Circuit Judges, and COOK, Senior District Judge.*

EBEL, Circuit Judge.

Petitioner–Appellant Timothy Gonzales ("Gonzales") challenges his convictions for attempted rape and felony murder under 28 U.S.C. § 2254. We conclude that under the Antiterrorism and Effective Death Penalty Act ("AEDPA") we must accept the finding of the Kansas court that Gonzales was not prejudiced by his counsel's error in failing to exclude hearsay evidence of a confession from his trial. We also hold that certain evidence that was wrongfully withheld by the State was exculpatory but, considered by itself, was not material. Moreover, when we aggregate the prejudice from Gonzales's counsel's error with prejudice flowing from the State's suppression of evidence, the cumulative effect of these mistakes was not prejudicial. Therefore, we AFFIRM the district court's order denying Mr. Gonzales's petition for writ of habeas corpus.

## FACTS

The body of Lora Beth Williamson was found in a Kansas cornfield on August 17, 1986. Williamson was last seen alive by witnesses the evening before at the Finney County free fair. At the fair, Gonzales and Adam Flores ("Flores") had been

---

* Honorable H. Dale Cook, Senior District Court Judge, Northern District of Oklahoma, sitting by designation.

spending time "checking out the scenery and checking out the women." After Flores and Gonzales noticed Williamson, Gonzales said "he was going to try to get it," and approached her. The two started a conversation and walked together while Flores followed behind. When they reached the parking lot, Flores stopped following them because "three's a crowd." The fair was ending, and that was the last Flores saw of Gonzales and Williamson that night. The next morning, Williamson's body was found.

Flores testified that he had been in Gonzales's car a few weeks before the murder and noticed a lock-blade knife on the console of the car. He stated that Gonzales had the same knife in a leather pouch fixed to his belt the night of the fair. The doctor who performed the autopsy testified that the victim died of knife wounds inflicted by a single-edged blade with a minimum length of two inches.

Officer Abundio Munoz ("Munoz") was on the night shift patrol when the victim was killed. Investigating a bonfire in close proximity to where the body was found, he noticed a car traveling in the area. Officer Munoz testified that his attention was drawn to the car because it was unusual to see any traffic in the area at that time of night. He followed the car, called in the license plates, and discovered that it was registered to Ernest Campos, Gonzales's brother-in-law. Campos testified that Gonzales had possession of the car that night because he was in the process of purchasing it.

Munoz was personally acquainted with Campos. He noticed that it was not Campos driving the car, and described the driver as a wet or sweaty Hispanic male with no shirt. Munoz did not pull the car over because the driver was neither driving erratically nor in violation of a traffic law.

Williamson had been stabbed numerous times and her throat had been cut. Though the upper portion of the body was soaked with blood, it was relatively clean from the waist down. Police found a semen stain on the victim's leg, which was collected and sent to the Kansas Bureau of Investigation ("KBI") for analysis. The semen was examined by KBI serologist Kelly Robbins ("Robbins"), who found no sperm in the sample. Robbins noted that a complete absence of sperm was somewhat unusual, and told investigators that one explanation for this might be if the murderer and attempted rapist had a vasectomy. The fact that there was no sperm evident in the sample was not disclosed to defense counsel and was not introduced by the State at trial. Gonzales has not had a vasectomy and has a normal sperm count.

Blood, hair, and saliva samples were taken from Gonzales. Robbins testified that based on the genetic markers in the saliva and blood, Gonzales could be the donor of the semen found on the victim's leg. Within the group of potential donors, approximately 26% of the Hispanic population would have all of the serological markers found in the sample, and 24% of the Caucasian population would have these markers.

Gonzales's car was searched and samples were taken. The tires were removed from the car and sent to the Federal Bureau of Investigation ("F.B.I.") in Washington, D.C. A tire tread expert testified that the tires from Gonzales's car matched the tracks from the crime scene in size and design, and at least one of the tires matched the wear of the tracks at the scene.

Two fibers found on the victim's jeans matched fibers from the seat of Gonzales's car in color and microscopic characteris-

tics. Additionally, investigators sprayed a substance called Luminol on the interior of the car to detect traces of blood not visible to the naked eye. Though the Luminol test indicated traces of blood, the source of the blood was inconclusive.

In November 1986, the police obtained a warrant and searched Gonzales's home. Under his bed, officers found a box containing pornographic magazines and a *Garden City Telegram* newspaper from August 18, 1986. The front page article was about Williamson's murder. When interviewed by a KBI agent, Gonzales explained that he had the paper in his room because his sister used newspaper to wrap her baby's diapers. Though Gonzales lived in the house with his sister, there were no diapers or baby supplies found in the room.

After Gonzales's arrest, he was placed in custody in the county jail. He was held in the same cell as Jack Spears, who was incarcerated for another crime but was also under suspicion for the Williamson murder. During the investigation of Gonzales's case, the KBI discovered that Spears had written a letter to another inmate alleging that Gonzales had confessed to killing Williamson. At trial, the letter was admitted into evidence before the State called Spears to testify and without objection by Gonzales's defense counsel, Dennis Bahr ("Bahr"). Because Spears invoked his Fifth Amendment right and refused to testify, Bahr was unable to question him about Gonzales's alleged confession. Spears testified at a hearing held after the trial that the letter was untrue, and that he wrote it to deflect suspicion for the crime away from himself.

A jury convicted Gonzales of one count of felony murder and one count of attempted rape. Gonzales was sentenced to life imprisonment on the felony murder charge, and, pursuant to the Habitual Criminal Act, Kan.Stat.Ann. § 21–4504, ten to forty years on the attempted rape. The sentences were ordered to run consecutively. A motion to modify the sentence was denied, and Gonzales appealed.

In December 1989, the Kansas Supreme Court affirmed Gonzales's convictions. *See State v. Gonzales,* 245 Kan. 691, 783 P.2d 1239 (1989). In August 1992, Gonzales filed a motion for state habeas relief pursuant to Kan.Stat.Ann. § 60–1507 in state district court in Kansas. In January 1994, the state district court denied him relief. In December 1994, the Kansas Court of Appeals affirmed the district court's denial of the § 60–1507 motion. *Gonzales v. State,* 887 P.2d 712 (Kan.Ct. App. Dec. 30, 1994) (unpublished opinion). Review was denied by the Kansas Supreme Court in March 1995.

In April 1997, Gonzales sought federal habeas relief pursuant to 28 U.S.C. § 2254 in the United States District Court for the District of Kansas. In November 1999, the district court denied Gonzales habeas relief as well as a certificate of appealability. *Gonzales v. McKune,* 76 F.Supp.2d. 1222, 1229 (D.Kan.1999). In December 1999, Gonzales filed notice of appeal seeking review by this court.

## DISCUSSION

### I. Standard of Review and Certificate of Appealability

The Antiterrorism and Effective Death Penalty Act ("AEDPA") applies to Gonzales's case because he filed his § 2254 petition after April 24, 1996. *See Hooks v. Ward,* 184 F.3d 1206, 1213 (10th Cir.1999). Under AEDPA, Gonzales must obtain a Certificate of Appealability ("COA") before he can appeal "the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court." 28 U.S.C.

§ 2253(c)(1)(A). He is not entitled to a COA unless he can make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Because the district court rejected his § 2254 petition on the merits, to satisfy § 2253(c) Gonzales must "demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel,* 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000). We construe Gonzales's notice of appeal, filed on December 30, 1999, to be a request for a COA, and because he has met the standard set forth in *Slack,* his request for a COA is granted.[1]

■ The standard of review under AEDPA is set forth in 28 U.S.C. § 2254(d), which provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Claims of ineffective assistance of counsel involve mixed questions of law and fact for purposes of review under § 2254. *See*

*Williams v. Taylor,* 529 U.S. 362, 402–403, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (reviewing question of prejudice in ineffective assistance of counsel claim under § 2254(d)(1)); *Battenfield v. Gibson,* 236 F.3d 1215, 1227 (10th Cir.2001); *Hale v. Gibson,* 227 F.3d 1298, 1314 (10th Cir. 2000); *Wallace v. Ward,* 191 F.3d 1235, 1247 (10th Cir.1999). Likewise, a determination of whether exculpatory evidence suppressed by a prosecutor is material presents a mixed question of law and fact which we review under the standard set forth in § 2254(d). *See Moore v. Gibson,* 195 F.3d 1152, 1165 (10th Cir.1999). If a state court did not hear the petitioner's claims on the merits, however, we review the district court's legal conclusions de novo and its findings of fact, if any, for clear error. *See, e.g., Hale,* 227 F.3d at 1309.

## II. Ineffective Assistance of Counsel

■ To prevail on an ineffective assistance of counsel claim, a petitioner must demonstrate (1) that representation fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defendant. *See Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Pursuant to this standard, Gonzales must show that defense counsel's performance was not simply wrong, but instead was completely unreasonable. *See Hoxsie v. Kerby,* 108 F.3d 1239, 1246 (10th Cir.1997). Gonzales bears a heavy burden to prevail on this claim, for he must overcome the presumption that defense counsel's actions were sound trial strategy. *See Strickland,*

---

1. This court has determined in *United States v. Gordon,* 172 F.3d 753, 753–54 (10th Cir. 1999) that even when a petitioner does not "renew his request for a COA in this court, we construe his notice of appeal as such a request." *See also* Fed.R.App.P. 22(b)(2), which states that "[a] request addressed to the court of appeals may be considered by a circuit judge or judges, as the court prescribes. If no express request for a certificate is filed, the notice of appeal constitutes a request addressed to the judges of the court of appeals."

466 U.S. at 689, 104 S.Ct. 2052. To show prejudice, the petitioner must establish that, but for counsel's errors, there was a reasonable probability that the outcome of his trial would have been different. *See id.* at 694, 104 S.Ct. 2052. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *See id.*

There are three instances in which Gonzales alleges he was denied effective assistance of counsel. We first address the question of whether any aspect of Bahr's performance was unreasonable.

## A. Failure to Object to Hearsay Confession Letter

■ Gonzales argues that defense counsel's failure to object to the letter written by Gonzales's cellmate, Jack Spears, was error under the first prong of *Strickland.* The letter alleged that Gonzales had confessed to the crime, offered a motive and description of Williamson's rape and murder, and asserted that Gonzales had other convictions for rape in Kansas and Texas.[2] Bahr made no objection when the State offered the letter into evidence, and it was therefore admitted. Bahr now concedes that he erred in failing to prevent the letter from being admitted, and that it served no strategic purpose in Gonzales's case. Bahr testified that he planned to cross-examine Spears on the letter when he was called to the stand, but that Spears prevented this by asserting his Fifth Amendment right not to testify. However, Bahr did not move to strike the letter from evidence even after Spears refused to testify.

The Kansas Court of Appeals held that Bahr's failure to object to the letter was error, but found that there was overwhelming evidence of guilt, and therefore the error was not prejudicial. *Gonzales,* No. 71,217, at 6. The federal district court agreed, concluding that the outcome of the trial would not have been different had the letter not been admitted. *See Gonzales,* 76 F.Supp.2d at 1227.

We agree that Bahr's failure to object to the letter was error, because it was hearsay and could readily have been excluded. Pursuant to Fed.R.Evid. 801(c), hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Spears's statements in the letter regarding Gonzales's alleged confession fit this definition. Given the clear availability of a hearsay objection, the lack of any strategic purpose for admitting the letter, and the potential importance of the letter to a jury's deliberations, we have little difficulty concluding Bahr's failure to object fell below an objective standard of reasonableness. Therefore, Gonzales has met the first prong of *Strickland* with respect to this issue.

## B. Failure to Pursue Fiber Expert Testimony

■ Gonzales next argues that Bahr erred in failing to pursue further direct examination of Larry Morris, a KBI trace examiner who conducted hair and fiber tests in an attempt to link Gonzales to the victim. During trial, Morris testified on behalf of the defense. Both the Kansas Court of Appeals and the federal district court concluded that the scope of Bahr's questioning of Morris was strategic and reasonable, and thus there was no error. We agree.

Morris specialized in hair and fiber examinations. After making comparisons between fibers found on Williamson and samples from Gonzales's car, Morris found

---

**2.** The text of Spear's letter is attached to this opinion as Appendix I.

no match. Morris's supervisor was dissatisfied with his collection methods from the victim's jeans, and had two additional sets of tests performed by other examiners. On the third test, matching fibers were found. Morris was later fired, in part due to his performance on Gonzales's case. *See Gonzales,* 76 F.Supp.2d at 1228. Gonzales argues that counsel should have questioned Morris about the tests that failed to find a match and used this evidence to impeach the examiner who found a match.

The subject of Morris's testimony at trial was limited to his findings regarding the hair found on Williamson's neck, which did not match a sample from Gonzales. Morris did not testify at all about his failure to find matching fibers from Gonzales's car because Bahr and the State had agreed before trial that if Bahr did not examine Morris about the car fibers, the State would not try to impeach Morris on the basis of his failure to match fibers from the car to fibers found on the body. Bahr therefore defended his decision not to question Morris about the car fibers as a strategic choice intended to preserve Morris's credibility with respect to the non-matching hairs found on Williamson's neck.

We agree with the district court's conclusion that "[s]uch decisions are reserved for the attorney, and there is a strong presumption that such decisions are reasonable." *Gonzales,* 76 F.Supp.2d at 1228. By avoiding a line of questioning about the fiber analysis, counsel averted a potentially damaging cross-examination about Morris's questionable forensic procedures. Instead, Bahr was able to present Morris's positive testimony to the jury about the non-matching hair found on Williamson's neck. Thus, this was sound trial strategy, not deficient under *Strickland.* Accordingly, we cannot say the Kansas Court of Appeals' determination on this issue was an unreasonable application of clearly established Supreme Court precedent.

**C. Failure to Question Other Witnesses and Elicit Testimony Regarding Other People Who May Have Been with the Victim on the Night of Her Murder**

■ Gonzales also suggests that Bahr failed to provide effective assistance of counsel because he did not interview witnesses who placed Williamson with other individuals at the fair that evening, and who might have cast doubt on Flores' testimony that Williamson left the fair with Gonzales. Faced with more than 100 affidavits by witnesses and reports from investigators, Gonzales alleges Bahr should have culled at least five that accurately identified Williamson at the fair on the correct night, and who saw Williamson in the presence of at least two other men. Gonzales argues that, had Bahr interviewed these witnesses, they could potentially have "decimated" Flores's testimony.

■ Gonzales is correct that an attorney has a duty to conduct a reasonable investigation, and that failure to do so may fall outside of the range of reasonable professional assistance. *See, e.g., Hale,* 227 F.3d at 1315; *Brecheen v. Reynolds,* 41 F.3d 1343, 1366 (10th Cir.1994). However, in this case we do not conclude that the failure to identify and interview these witnesses was deficient in light of the large number of statements taken by investigators and the fact that their relevance was not strongly evident on their face. None of the witnesses suggested that Williamson left the fair with anyone other than Gonzales. Furthermore, some of their statements were inconsistent with other evidence as to when Williamson was at the fair, what she was wearing, and with whom she was seen.

We presume that Bahr acted reasonably when he chose not to examine these witnesses, and we agree with the Kansas Court of Appeals that Gonzales failed to rebut that presumption. Therefore, Bahr's decision not to investigate potential witnesses further was not an error under *Strickland.*

## III. Evidence Withheld from Defendant

■ We now turn to whether the State's failure to disclose information about lack of sperm in the semen sample violated *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In *Brady,* the Supreme Court held "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. 1194.

■ This court has established three requirements to establish a *Brady* violation: (1) the prosecutor suppressed evidence; (2) the evidence was favorable to the defendant as exculpatory or impeachment evidence; and (3) the evidence was material. *See Smith v. Roberts,* 115 F.3d 818, 820 (10th Cir.1997) (citing *Fero v. Kerby,* 39 F.3d 1462, 1472 (10th Cir.1994)).

■ Laboratory analysis of the semen found on Williamson's leg revealed that there were no traces of sperm in the sample. Though the KBI serologist who examined the sample suggested that investigators confirm whether a suspect was a sperm producer, she did not include this finding in the written report sent to the State.[3] As will be discussed below, the

KBI's failure to find sperm in the sample does not conclusively exclude Gonzales as a potential donor. The Kansas Court of Appeals therefore concluded that Gonzales's *Brady* claim failed because the evidence was not "clearly exculpatory." We hold this finding was clearly erroneous. Evidence withheld by the government need not conclusively exonerate a defendant in order to qualify as *Brady* material. *See, e.g., Smith v. Secretary of New Mexico Dep't of Corr.,* 50 F.3d 801, 825 n. 37 (10th Cir.1995). Rather, the evidence need only be "favorable" to the defense. *See id.* In this case, the absence of sperm in the sample clearly does carry probative weight making it less likely that Gonzales was the donor, and therefore the information was exculpatory. Moreover, it is clear the State failed to inform Gonzales that the sample contained no sperm cells. Therefore, Gonzales has met the first and second requirements necessary to show a *Brady* violation.

## IV. Strickland Prejudice and Brady Materiality

Gonzales has established that (1) Bahr's failure to object to the confession letter fell below an objective standard of reasonable performance, and (2) the State's failure to inform him that it could not detect sperm in the semen sample deprived him of favorable evidence which he could have presented at trial. Therefore, we must continue our analysis to determine whether these errors give rise to a reasonable probability that, but for these mistakes, the outcome of Gonzales's trial would have changed—that is, that our confidence in the outcome of the trial has been undermined. *See Strickland,* 466 U.S. at 694,

---

**3.** Though there is no evidence to suggest the State's withholding of evidence was either calculated or malicious, this court has previously held that "negligent or inadvertent suppression of evidence is nevertheless suppression for *Brady* purposes." *Fero,* 39 F.3d at 1472.

104 S.Ct. 2052; *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

 Because the Kansas Court of Appeals did not reach the issue of whether the failure to find sperm in the semen sample was material, we address this question de novo. *See* § 2254(d)(1); *Battenfield,* 236 F.3d at 1220; *Hooks,* 184 F.3d at 1223. On the other hand, the Kansas court used the proper legal standard for evaluating the prejudice prong of the claimed *Strickland* errors. Accordingly, as to the ineffective assistance of counsel error, we ask only whether the Kansas state court decision that this error was non-prejudicial was "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

### A. Spears's Confession Letter (*Strickland* Issue)

 Gonzales's trial counsel seriously erred in failing to prevent the admission of Spears's confession letter. In addition to providing Gonzales's alleged confession, the letter states that Gonzales carried out the crime because Williamson refused to allow him to sodomize her, and because he became enraged when she defended herself by striking his genitals. Moreover, the letter includes a graphic depiction of the details of the crime as Spears imagined it to have occurred. Finally, Spears alleged that Gonzales had additional rape convictions in Texas and Kansas. The letter was, in all respects, apt to provoke shock and disgust in members of the jury.

In addition to the improper allegation of prior rape offenses and the graphic description of the crime itself, we are especially concerned about the impact of Gonzales's purported confession. "[T]he confession is a dramatic and impressive type of evidence." *Bond v. Oklahoma,*

546 F.2d 1369, 1376 (10th Cir.1976). To a jury which may otherwise be uncertain about a defendant's guilt in light of evidence presented, a confession can erase any traces of doubt. In *Bruton v. United States,* 391 U.S. 123, 139–40, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (White, J., dissenting), Justice White discussed the compelling nature of a confession.

[T]he defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.... Even the testimony of an eyewitness may be less reliable than the defendant's own confession. An observer may not correctly perceive, understand, or remember the acts of another, but the admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so.

*See also Arizona v. Fulminante,* 499 U.S. 279, 296, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) ("[A] full confession in which the defendant discloses the motive for and means of the crime may tempt the jury to rely upon that evidence alone in reaching its decision...."); *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) (holding that a jury is unable to heed a limiting instruction when presented with a co-defendant's confession that implicates defendant).

Despite this, *Strickland* prejudice was decided by the Kansas state court under correct U.S. Supreme Court law, so we review it only to determine if it involved a clearly erroneous application of law to the facts to conclude that Spears's letter was non-prejudicial. *See* 28 U.S.C. § 2254(d)(1); *Williams,* 529 U.S. at 407–

08, 120 S.Ct. 1495. Were we to address this de novo, we would be inclined to conclude it is prejudicial because of the uniquely important impact of confessions. But just because we believe the state court's decision was wrong does not mean it was clearly erroneous. The evidence of guilt was very strong, and we cannot say it is clearly erroneous for the Kansas court to conclude that the admission of the confession did not cast doubt on the reliability of the process or that the outcome probably would have been different.

**B. Serologist's Report (*Brady* Issue)**

 The Kansas Court of Appeals held that Robbins's inability to detect sperm in the semen sample found on Williamson's body was not "clearly exculpatory." Since the state court did not address the question of materiality, we have no proper state decision to give deference to, and we therefore review the district court's decision de novo. *See Battenfield,* 236 F.3d at 1220; *LaFevers v. Gibson,* 182 F.3d 705, 711 (10th Cir.1999). The state court relied on testimony from John T. Wilson, chief forensic chemist at the Regional Crime Laboratory in Kansas City, Missouri, who said that, while he would expect to find sperm in a normal donor's semen sample, the absence of sperm would neither prove nor disprove that the donor was a sperm producer. *See Gonzales,* 71,217 at 4.

We cannot say that the result of Gonzales's trial probably would have been different had this information been disclosed to the defense. Again, we have strong evidence of guilt, and the *Brady* material is only equivocal. There was no suppressed evidence of the likelihood that the donor was unable to produce sperm. Rather, Wilson testified that even a normal emission from a normal donor will have portions with very little actual sperm.

Moreover, age, heat, humidity, bacteria, and ultraviolet light can all degrade the quality of a sample and reduce the likelihood of finding sperm cells. Finally, Wilson testified that Robbins's use of a moist cotton swab to collect the sample reduces the likelihood of finding sperm because many cells adhere stubbornly to the cotton fibers, and some fluids used to moisten swabs can break down sperm cells.

All we know, therefore, is that sperm was not detected in the small sample tested. It is pure speculation, unresolved by the alleged *Brady* material, that it is even "likely" that the donor was unable to produce sperm. Therefore, we conclude the information was not material under *Brady*.

**V. Cumulative Error**

 Finally, we need to perform a cumulative error analysis. Faced with established errors at trial, a court must consider the cumulative impact of those errors in light of the totality of the evidence properly presented to the jury. *See, e.g., Strickland,* 466 U.S. at 695–96, 104 S.Ct. 2052. As the Court explained in *Strickland,*

> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. . . . Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. . . . Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent

the errors.[4]

*Id.; see also Kyles v. Whitley,* 514 U.S. 419, 436, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (holding that courts are to consider the cumulative impact of *Brady* errors when determining whether undisclosed evidence was material); *Chaney v. Brown,* 730 F.2d 1334, 1339 (10th Cir.1984) (considering *Brady* materiality); *Kubat v. Thieret,* 867 F.2d 351, 370 (7th Cir.1989) (considering *Strickland* prejudice); *United States ex. rel. Marzeno v. Gengler,* 574 F.2d 730, 736–37 (3d Cir.1978) (considering *Brady* materiality).

 Although the Kansas court did its own cumulative error analysis, it did not consider the prejudicial impact of the *Brady* error either individually or cumulatively. Accordingly, its cumulative error analysis similarly "was contrary to, or involved an unreasonable application of, clearly established Federal law." § 2254(d)(1); *cf. Williams,* 529 U.S. at 402–403, 120 S.Ct. 1495. Therefore, we review the cumulative error issue de novo. See *Hooks,* 184 F.3d at 1223. In spite of the clear authority holding that courts should consider *Strickland* and *Brady* errors cumulatively to determine whether a petitioner has demonstrated prejudice and materiality, respectively, we could find no cases considering *Brady* and *Strickland* errors together to determine whether the errors collectively undermine confidence in the outcome of a trial. Nevertheless, both tests were established to preserve the integrity of the trial process, and they adopt

similar standards to reach this goal. *Cf. Strickland,* 466 U.S. at 696, 104 S.Ct. 2052 (rejecting a mechanical application of the test and holding "the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged"); *Bagley,* 473 U.S. at 674–75, 105 S.Ct. 3375 ("A fair analysis of the holding in *Brady* indicates that implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial." (quoting *United States v. Agurs,* 427 U.S. 97, 104, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976))). Thus, we can see no basis in law for affirming a trial outcome that would likely have changed in light of a combination of *Strickland* and *Brady* errors, even though neither test would individually support a petitioner's claim for habeas relief.

 In this case, neither the state nor the district court below considered the cumulative impact of the *Strickland* and *Brady* errors, and we therefore review this question de novo. But in this analysis, we must accept, contrary to our own belief, the conclusion of the Kansas state court that the confession letter was not prejudicial. Thus, the narrow question is whether the *Brady* material would tip the scales. For the reasons stated above in our *Brady* discussion, we think not. Williamson was seen together with Gonzales on the night of the crime, and his companion testified that Gonzales possessed a knife similar to that used to commit the murder. A tire tread expert testified that one of Gon-

---

4. In *United States v. Rivera,* 900 F.2d 1462, 1471 (10th Cir.1990) (en banc), we stated that "a cumulative-error analysis should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors." *Rivera* considered both the performance and prejudice prongs of each individual act of alleged ineffective assistance of counsel under *Strickland* in order to determine whether there was error that could be cumulated. The consideration of the prejudice prong prior to cumulation of the effects of all the counsel's inadequate performance was dicta, however, since we concluded that there was no deficient performance. *See id.* at 1474. In fact, *Strickland,* as quoted above, makes it clear that all acts of inadequate performance may be cumulated in order to conduct the prejudice prong.

zales's tires showed wear and a tread pattern that was consistent with an impression found at the scene. A police officer identified Gonzales's car in the general vicinity of the crime at about the time it took place. The serology report on the semen left on the scene indicated that it was consistent with Gonzales's serology profile. Investigators found spots of blood in Gonzales's car, and matched two fibers found on Williamson to fibers in the car. In light of this evidence and our deferential review of the *Strickland* error, we conclude there is not a reasonable probability that the outcome of the trial would have changed.

## CONCLUSION

For the foregoing reasons, we hold that Gonzales has not demonstrated he was prejudiced by the impact of his counsel's errors and the State's failure to turn over exculpatory evidence. Therefore, we AFFIRM the judgment of the district court.

## APPENDIX I

Wed., July 15, 1987

Hello my friend,

Hows everything been going? Well I doing about all I can do, and that isn't very much. I got your letter today, for awhile was wondering if you received mine. they moved that wetback tim Gonzolas last week because I was going to kick his ass, he told me he killed that Girl just because he tryed to fuck her in the ass and she wouldn't let him so he tried to hold her down so she grab his balls and started to squess and yank the fuck right out of them so he went and grab a knife and stab and sliced her throat. That mother fucker ought to get the same treatment, he has a prior record of rapes in texas and one hear. Im thinking about testafing against him in court, now don't get me wrong

Kevin Im no nark. Its just that allot of people think that I did it and I imagine thats why my bond is so fucking high and another reason is I hate him and would really enjoy giving him a taste of his own medicine. I told Barb Hi for you today, she said hi Back

Im sure glad that your writing back Kevin Because your are the only friend of mine that rights me, I guess you can really tell who your friends are when your in a jam like were in. I know if I do get out of this mess I'll remeber the cocksuckers who I've done favors for and smoked up and bought beers for. Its seem's like nobody cares anymore but now I know now my friends from my party buddies and them party buddies ain't shit.

Well, I have one and a half months left in this county jail before my trial. I quit smoking cigaretts a long time ago, I figured I need my lungs to breath with In case I get into a fight with someone. My little brother Joe went on vacation last week, I haven't seen him for awhile, I think that he forgot about me. this shit sucks kevin but what the fuck can we do about it. I think that these pigs here watch too many cop show's on t.v., I'm Just waiting for my trial, I stopped worrying a long time ago—fuck all those mother fuckers in the mouth!

Well Bro, Im going to sign off now because its just about time for me to give this pencil back to the guards, they only let me have it for an hour a day, that sucks doesn't it, they only do that to me because Im dangerous—Jack Hammer